IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN TELECOM CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1627C |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX OF EXHIBITS TO DEFENDANT'S MOTION FOR PARTIAL DISMISSAL**

Exhibit | Page


Complaint of American Telecom Corp. Before the Interior Board of Contract Appeals, filed December 10, 1999 — 001

Government's Answer to Complaint of American Telecom Corp. Before the Interior Board of Contract Appeals, filed January 10, 2000 — 008

Government's Motion to Dismiss Before the Interior Board of Contract Appeals, filed October 10, 2000 — 015

Order Before the Interior Board of Contract Appeals, issued October 25, 2001 — 018

Appellant's Motion to Withdraw Appeal Before the Interior Board of Contract Appeals, filed November 9, 2001 — 022

Order Before the Interior Board of Contract Appeals, issued October 25, 2001 — 025

Declaration of Daniel McCarthy, Contracting Officer — 026

- Attachment 1–Contracting Officer's Final Decision Terminating Delivery Orders for Default, dated October 29, 1999 — 028
- Attachment 2–Appeal of American Telecom Corp. Before the Interior Board of Contract Appeals, filed November 9, 1999 — 031
- Attachment 3–Cover Page and Section III of Albany VA Project, Contract No. 1435-01-99-RG30978 — 033

Before the
INTERIOR BOARD OF CONTRACT APPEALS
Arlington, Virginia

| | | |
|---|---|---|
| AMERICAN TELECOM CORPORATION, Appellant, v. DEPARTMENT OF THE INTERIOR MINERALS MANAGEMENT SERVICE, Respondent. Contract No. 1435-01-99-RC30978/82115 and Contract No. 1435-01-99-RC30982/82140 | ) | IBCA Nos. 4164-1999 4165-1999 |

RECEIVED
DEC 10 1999
OFFICE OF THE SOLICITOR

## COMPLAINT

Pursuant to the Rules of Procedure of the Interior Board of Contract Appeals ("IBCA") American Telecom Corporation ("ATC") hereby files this Complaint in the above-styled matter.

## COUNT I
### (Improper Default Termination)

1. Both of the delivery orders at issue in the above referenced cases were issued on the same day and relate to the same project, the renovation of the telephone and data system at the Department of Veterans Affairs ("VA"), Samuel S. Stratton Medical Center ("VAMC") in Albany, New York.

2. On January 29, 1999, ATC was awarded two delivery orders, on indefinite delivery, indefinite quantity ("IDIQ") contracts, administered by the Department of the Interior, ("DOI") Minerals Management Service.

3. These two delivery orders (Nos. 1435-01-99-RC30978/82115 and 1435-01-99-RC30982/82140) were in simplified terms, for rewiring the Medical Center's inside and outside telephone and data plant.

4. Shortly after work commenced on the project, ATC began encountering unexpected difficulties.

5. ATC's proposal for this contract -- and the parties' price negotiations -- were predicated upon several reasonable assumptions. ATC planned on installing the horizontal conduit and cable in an ordered fashion utilizing the clear paths depicted on the drawings. Because of the nature of the project, these are critical activities on the schedule. At the same time, ATC would be building the telephone closets, installing the vertical risers and also installing the outside cable plant as crews became available as the horizontal plant was completed.

6. ATC reasonably assumed that the VA's plans accurately showed the conditions that would be found on the site, with the possibility of minor modifications to be worked out as the job progressed, as on any other project.

7. When ATC began work, it discovered that, in virtually every hallway, it was impossible to install the trays as shown on the drawings because of numerous obstructions.

8. ATC encountered problems and obstructions in virtually every room in which it installed station drops. The drawings, again, do not show any obstructions in the rooms.

9. The impact of these problems required ATC to use more cable trays, conduit and cable than it reasonably anticipated based on the drawings and specifications. This is due to the fact that every time ATC had to work around an undisclosed obstruction, it had to use more material. This seriously impacted ATC's material delivery plan.

10. The second result of these problems was that it took almost twice as long to work in each room and substantially more time to work in each hallway than ATC had planned. Thus, the progress of ATC's crews was severely hampered as they had to work around one problem after another, instead of being able to install the horizontal plant in straight runs as planned.

11. ATC encountered numerous undisclosed conditions throughout the VAMC that differed materially from the conditions depicted in the contract and from those that would ordinarily be encountered or expected in a job of this type.

12. Although ATC performed a pre-bid site inspection, the actual conditions above the ceilings were neither readily observable nor disclosed by the VA or DOI at that time.

13. These conditions include access panels, shown on the drawings, which when removed are completely obstructed or which provide absolutely no access whatsoever. Wiring and conduit runs, which are depicted on the drawings as straight runs, are, in fact, not straight and bear absolutely no resemblance to the conditions depicted on the drawings.

14. The conditions encountered, and the variance from the drawings, far exceeded the type of variance which is to be expected on a job of this nature.

15. Another serious problem that ATC encountered involved the metal ceilings in several hundred patient and other rooms. These ceilings appear to be drop ceilings with metal panels. However, the metal panels in many of these rooms are screwed together and have to be removed in large sections to gain access to the conduit locations for the drops. Even more serious, though, are the rooms in which the metal ceiling panels are attached to hidden and undisclosed heating elements located above them. These panels cannot be moved and ATC had to take extraordinary steps to work around them.

16. Each room with a metal ceiling took a two-man crew much more time than would reasonably be anticipated to manipulate the metal panels to gain access to the ceiling spaces.

17. At no time did the VA or DOI apprise ATC of the unique design or construction of these ceiling panels prior to contracting.

18. The VA, which had been occupying these premises for a number of years, had knowledge of these conditions.

19. The VA or DOI should have accurately depicted the conditions on the contract drawings or otherwise provided ATC with this information.

20. As ATC encountered unforeseen and undisclosed site conditions, it brought each to the attention of the COTR, Harry Denkers.

21. Mr. Denkers was on site continuously and both observed and was informed of these situations and differing site conditions as they were encountered.

22. In instances in which ATC was required to deviate from the designated pathway, ATC's crews had to stop work until Mr. Denkers was consulted for direction on how to proceed. Mr. Denkers then issued specific orders to ATC directing ATC to perform in a particular manner and relocate the cable pathways.

23. These orders are compensable both in time and price under the Changes Clause, Differing Site Conditions Clause and other clauses of the contract.

24. The additional bends and turns in the cable pathways made the actual cable installation much more difficult and time-consuming. Every time ATC's crew had to negotiate a bend or turn in the pathway while installing the cable, it took additional time. This effect was significantly increased when dealing with the larger cable closer to the telecom closets.

25. The above described interior problems impacted ATC's performance on the outside cable plant delivery order because ATC was not able to use its crews on the outside plant as planned. The labor scheduled to be working on the outside cable plant was instead required to be used inside the VAMC due to the numerous differing site conditions and other problems encountered there.

26. The government's termination of ATC's contract for default was improper because it was the government and not the contractor who was responsible for the problems and the delay. Furthermore, the government failed to properly consider the factors identified by the FAR in determining whether to terminate the contract and failed to properly consider alternatives to a default termination.

27. Where the government knows of a project delay for which it -- and not the contractor -- is responsible, it may not in good faith rely on the original contract completion date to sustain a default. Instead, it is contractually bound to equitably adjust the contract and allow the contractor to perform with a new, extended completion date.

28. A contractor's right to proceed should not be terminated if the delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the contractor.

29. A default termination is a severe sanction that was not warranted by the facts of this case.

30. The default termination in the present case is also improper because the government failed to follow proper procedures and failed to notify the cognizant Small Business Administration ("SBA") office of the cure notice and proposed default.

31. The contract completion date should have been extended to compensate for the undisclosed conditions. Furthermore, ATC is entitled to a contract price adjustment.

WHEREFORE, ATC requests:

1. That the termination for default be converted into a termination for convenience;

2. That ATC be awarded such compensation as it is due under the termination for convenience clause of its contract;

3. That subsequent to the conversion of the termination for default into a termination for convenience ATC be permitted to pursue its claims for an equitable adjustment to the contract price for the differing site conditions and other conditions described above; and

4. Such other relief as the Court may deem appropriate.

Respectfully submitted,

Victor G. Klingelhofer

Victor G. Klingelhofer
John J. O'Brien
COHEN MOHR, LLP
Suite 504
1055 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone: (202) 342-2550
Facsimile: (202) 342-6147

Counsel for Appellant

Dated: December 9, 1999

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December 1999, a copy of the foregoing was served by mail on:

Sherry Kaswell
Department of the Interior,
Division of General Law
1849 C Street, NW
Washing ton D.C. 20240-0001
MS 6530 - MIB

Victor G. Klingelhofer

OFFICE OF HEARINGS AND APPEALS
Interior Board of Contract Appeals
4015 Wilson Boulevard
Arlington, Virginia 22203

| | |
|---|---|
| Appeal of American Telecom Corporation<br><br>Contract No. 1435-01-99-RC30978/82115<br><br>Contract No. 1435-01-99-RC30982/82140 | IBCA Nos. 4164-1999<br>4165-1999 |

GOVERNMENT'S ANSWER

The Minerals Management Service (MMS), through its undersigned Counsel, hereby files the following Answer to the Complaint filed by American Telecom Corporation (ATC) on December 9, 1999.

COUNT I
(Improper Default Termination)

1. Admit.

2. Admit. The Government notes that the delivery orders were issued on a firm fixed price basis (*See* Appeal File, Tabs D-1 and E-1).

3. Admit.

4. The Government lacks sufficient information to admit or deny this paragraph, and, therefore, denies same.

5. The Government lacks sufficient information to admit or deny this paragraph, and, therefore, denies same.

6. Deny. The Government further states that ATC conducted a site visit in the summer of 1998 and knew or should have known of the physical layout of the work areas. ATC had its own personnel on site as early as November 2, 1998 and was allowed pre-contract costs under Task Order 82115. (*See* Appeal File, Tabs D-1-2 and E-1-2). Further, notes to the plans indicated that variations could be present (*See, e.g.*, Appeal File, Tabs Q and Q-1).

7. Deny.

8. This paragraph is denied except to admit that ATC did have problems in installing station drops in some rooms. These problems were due to poor workmanship and planning on the part of ATC and not due to obstructions (*See, e.g.*, Appeal File Tabs G and I).

9. Deny. The Government further states that the problems ATC experienced concerning material delivery were the result of its own poor planning for the requirements of the job. To the extent that more material may have been required, it was due to errors in the contractor's take off and the need to replace cable incorrectly installed by ATC (*See, e.g.*, Appeal File, Tabs F-2, J, N, O, P, P-2, and S, under "Material" dates 5/6/99, 6/29/99, 7/6/99, 7/13/99, 7/20/99, 8/3/99, 8/10/99, 8/17/99, 8/31/99, 9/14/99, 9/21/99, 10/12/99 and 10/26/99).

10. The Government denies this paragraph except that it admits that the work took far longer to complete than anticipated. The delay was attributable to ATC based on factors including but not limited to incorrect installations, poor workmanship, the use of unskilled workers, lack of proper material and supplies on site, lack of coordination between field personnel and the corporate office (*See* citations to Appeal File in response to paragraphs 8 and 9, above).

11. Deny.

12. The Government admits that ATC performed a pre-bid site inspection but denies the remainder of this paragraph. Negotiations for this contract took over 5 months, affording ATC ample opportunity to revisit the site as necessary. All ceilings were readily accessible for inspection by ATC, depending on the type of ceiling, by either removing ceiling tiles, opening access panels, or opening clips or screws on those ceilings which had metal panels.

13. Deny the first sentence except to admit that in the very limited cases in which an access panel was obstructed (perhaps one or two), access was readily gained through another panel. Deny the second sentence. This allegation demonstrates that ATC was not familiar with Note 7 of the General Notes on Drawing 1-E-1 which states the following: "Cable tray and conduit runs shown are meant to indicate general locations. Bends or rises /dips may occur. Modify run (as required) while still maintaining all requirements of cable tray and conduit installations as outlined on drawings and in the specifications" (See Appeal File, Tab Q-1). *

14. Deny.

15. The first sentence is denied except to admit that there are metal ceilings in several hundred patient rooms. The second sentence is admitted. The third sentence is denied except to admit that in approximately 25% of the rooms with metal ceilings, the metal panels are screwed to the ceiling grid. Access above these ceilings may require unscrewing more than one panel, but usually no more than two or three panels per drop.

The fourth sentence is denied except to admit that some of the metal panels are radiant heat panels. However, complete access could be gained through perimeter panels, none of which had heating elements. The fifth sentence is denied. The VA did provide the contractor with information on the ceilings in question at the time they first began work on rooms with metal ceilings (Wing 9B). This included the name and the phone number of the ceiling manufacturer's representative. This person could provide the information needed by ATC and could supply the tools and replacement panels that might be needed. Any difficulties ATC encountered relative to the ceilings were due to the lack of experienced contractor personnel.

16. Deny. The fact that ATC took longer to complete the tasks in rooms with metal ceilings was due to the lack of experience and poor workmanship of its personnel *See, e.g.,* Appeal File, Tab S, 2/23/99, "Ceiling 9B," and 3/2/99, "Ceiling 9B" and "Work Area").

17. Deny. The contract specifications and drawings were appropriate for a project of this type. ATC conducted a pre-bid inspection and had ample opportunity to revisit the site during the 5 months of contract negotiations.

18. The Government admits that the VA had been occupying the premises at issue for a number of years. Because it is not clear which specific conditions ATC is alleging the VA had knowledge of, the remainder of this paragraph is denied.

19. Denied to the extent that ATC is alleging that the Government did not accurately depict the conditions on the contract drawings. The drawings and specifications were very complete and were of the type expected to be encountered in a job of this type. It was the contractor's responsibility to conduct an adequate site investigation.

20. The Government admits that questions were brought to the attention of the Contracting Officer's Technical Representative (COTR), Harry Denkers, but denies that they concerned unforeseen or undisclosed site conditions with the exception of extra asbestos abatement required in the basement.

21. Admit that Mr. Denkers was on site, working a split shift from 1 p.m. to 5 p.m. and 7 p.m. to 11 p.m. during the period February 1999 through October 1999 (contract termination) but deny the remainder of this paragraph. The COTR did not see any unforeseen site conditions, except for the extra asbestos abatement in the basement. However, the COTR observed lack of planning, lack of material, lack of qualified technicians, lack of coordination between the field and corporate office and poor workmanship as exhibited during the inspections performed with the ATC field superintendent (*See* citations to Appeal File in response to paragraphs 8 and 9, above).

22. Deny the first sentence except to admit that Mr. Denkers was consulted for direction during the course of the contract. Deny the second sentence. Mr. Denkers conferred with ATC personnel and approved relocation of cable pathways as discussed with ATC personnel. Any delays or "stops" that were encountered were due to ATC's lack

of material and skilled technicians (*See* citations to Appeal File in response to paragraphs 8 and 9, above).

23. Deny.

24. Deny . In view of the warning contained in Note 7 of the General Notes on Drawing 1-E-1 (quoted in response to paragraph 13, above), ATC should have performed a field investigation prior to beginning cable installation and scheduled the work and crews accordingly. The additional time ATC claims was required was due to its own lack of planning and poor workmanship.

25. Deny. ATC was not permitted to start the outside work until it presented a plan and schedule for the work. ATC was also required to prove that it had all the materials present at the site to perform the outside work. This was never done. (*See, e.g.,* Appeal File, Tab S, 7/20/99, "Bldg. 7," 8/3/99, "Bldg. 7," 9/21/99, "Bldg. 7," 10/12/99, "Bldg. 7," and 10/26/99, "Bldg. 7.")

26. Deny. The Government's termination of ATC's contracts for default was proper based on its failure to make progress in order to meet the contract completion date. Problems and delay on these contracts were attributable to ATC and not the Government. The Government followed all procedures under the FAR in deciding to terminate the contract for default and properly considered the appropriateness of alternatives to default termination.

27. This paragraph is a statement of case law to which no response is required, but the Government denies the applicability of this statement to the present situation since the Government was not responsible for the project delay.

28. This paragraph is a statement of case law to which no response is required, but the Government denies the applicability of this statement to the present situation since the delay in completing the work did not arise from unforeseeable causes beyond the control and without the fault or negligence of the contractor.

29. The Government admits that a default termination is a severe sanction but denies that it was not warranted by the facts of this case.

30. Deny. The default termination was proper. SBA was consulted and advised prior to the issuance of the Cure Notice and Termination. (See Appeal File, Tabs A and B).

31. Deny.

The Government denies that ATC is entitled to the relief requested or to any relief whatsoever.

Except to the extent expressly admitted or qualified above, the Government denies each and every allegation in the Complaint.

The Government respectfully requests that the Board consider the following additional points:

1. ATC conducted an initial pre-bid site inspection at the Albany Veterans Affairs Medical Center during the summer of 1998;

2. Negotiations for the subject contracts took over 5 months, providing ample time for the contractor to revisit the site as necessary;

3. ATC placed personnel on site as early as November 2, 1998 to prepare for the upcoming job. When the contracts were issued on January 29, 1999, the contractor was allowed pre-contract costs back to November 2, 1998. Again, this afforded ample opportunity for the contractor to conduct inspections of facility conditions. (*See* Appeal File, Tabs D-1-2 and E-1-2);

4. The drawings and specifications provided were very complete and of the type expected to be encountered on a job of this type;

5. A kick-off meeting was conducted on January 6, 1999. Project ground rules, including establishing a change order process, were documented (*See* Appeal File, Tab F). Corrections to conditions described in ATC's complaint were never submitted or processed through the change order process;

6. ATC fell behind schedule early in the project and continued to fall further behind as the job progressed. Failure to progress resulted from lack of materials throughout the project, use of inexperienced workers not possessing the proper trade skills, and overall mismanagement of the project by ATC;

A. Concern over lack of materials is documented, for example, in Appeal File, Tabs F-2, J, N, O, P, P-2, and S under "Materials." See also Tab S, 5/18/99 under "Note;"

B. Poor workmanship resulting from inexperienced workers is highlighted, for example, in Appeal File, Tabs C-2, paragraphs (b), (e), (m), and (o), G, I-3 and I-4, and the following cites in Tab S:

3/16/99 "Bldg. 7, 2nd Area of Work"
6/8/99 "Wing 2B, 8D"
6/22/99 "Work Area Condition," "Materials," and "Box Installation"
7/20/99 "Wing 10B"
8/17/99 "Building 3 Work"

C. At a September 28, 1999 weekly project meeting, it was revealed that all cable terminations to date, listed as complete on the weekly minutes, were in reality only partially completed. The contract specifications required terminations of both voice and date lines. The contractor had terminated only date lines. Thus, with less than 5 weeks remaining in the 9-month plus period of performance, none of the 48 wings of the hospital were completed (*See* Appeal File, Tab S, 9/28/99 at 3);

D. ATC failed to provide the Government with updated monthly GANTT charts as required by the contract (*See* Appeal File, Tab D-1-2). In addition, when GANTT charts were provided to the Government, there were many instances where ATC was already behind the schedule indicated and they never provided a usable schedule (See Appeal File

C-2-1 at c). Project milestones routinely were not met (*See, e.g.*, Appeal File, Tabs C-2-1, paragraph (c), F-2, N, and S 3/16/99, 7/6/99, 10/12/99 and 10/26/99 under "Schedule");

E. ATC failed to respond to Government requests for information on many occasions. Corporate management's response to ongoing issues was poor. (*See, e.g.*, Appeal File, Tabs N and S);

F. During the period of performance, ATC experienced a very high rate of turnover among its personnel. Engineering and Project Management personnel were in a constant state of flux (*See, e.g.*, Appeal File, Tabs B-1 and K). Overall project management was poor;

7. The Government issued a letter of concern to the contractor on May 20, 1999 (Appeal File, Tab J);

8. The Contracting Officer issued a Cure Notice on July 14, 1999 (Appeal File, Tab B);

9. The contractor responded to the Cure Notice with a detailed Remedy Plan dated 7/28/99 (Appeal File, Tab B-1): The Government allowed the contractor to continue performing based on the actions outlined in the Remedy Plan;

10. ATC failed to perform in accordance with the Remedy Plan, resulting in the Contracting Officer's issuance of a Show Cause Letter on October 4, 1999 (Appeal File, Tab C);

11. Contracts 1435-01-99-RC30978/82115 and 1435-01-99-RC30982/822140 were terminated for cause on October 29, 1999 (Appeal File, Tab A).

Respectfully Submitted,

\S\

Sherry Kinland Kaswell
Department Counsel
1849 C Street, N.W.
MS 6530
Washington, D.C. 20240
Telephone: (202) 208-6201
Facsimile: (202) 219-1790

Dated: January 10, 2000

CERTIFICATE OF SERVICE

This is to certify that a true copy of the foregoing Government's Answer was telefaxed and hand-delivered on this 10th day of January 2000 to:

Victor G. Klingelhofer, Esq.
Cohen Mohr, LLP
Suite 504
1055 Thomas Jefferson Street, NW
Washington, D.C. 20007
Facsimile: (202) 342-6147

/S/

Sherry Kinland Kaswell

cc: Kaswell
Subject
Reading

SKKASWELL:cea 1-10-00 \SHERRY\AMTELECOM\ANSWER